IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiffs,<br><br>       vs.<br><br>SKYLER F. SANDERS,<br><br>                              Defendant. | **8:19CR397**<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter is before the Court for Findings of Fact and Conclusions of Law pursuant to Federal Rule of Criminal Procedure 23(c), following a nonjury trial held on August 31 and September 1, 2021.  At trial, the United States was represented by Donald J. Kleine. Defendant, Skyler Sanders, was represented by D.C. Bradford. Following trial and preparation of the Trial Transcript ("TT") (Filing Nos. 135, 136)[1], the parties submitted written closing arguments (Filing Nos. 137, 150, and 151).

## I.     SECOND SUPERSEDING INDICTMENT

The Second Superseding Indictment alleges that On August 16, 2019, Sanders and Co-Defendant Melvin L. Wilson robbed a Bank of the West branch in Omaha, Nebraska.[2] Filing No. 40.  The Second Superseding Indictment charged both Defendants with one count of bank robbery—in violation of 18 U.S.C. §§2, 2113 (a) (Count I)—and one count of brandishing a firearm in furtherance of a crime of violence—in violation of 18 U.S.C. §§ 2, 924(c)(1)(A) (Count II).  Sanders pled not guilty and waived a jury trial.

---

[1] Unless otherwise indicated, page references in these Findings of Fact and Conclusions of Law are to the consecutively paginated Trial Transcript at Filing Nos. 135 and 136.

[2] For sake of simplicity, references to "Bank of the West" in these Findings of Fact and Conclusions of Law refer to the Bank of the West branch located at 8707 Center Road, Omaha.

Wilson pled guilty to both counts and was sentenced to thirty months on Count I and thirty months on Count II, to run consecutively.  Filing No. 146.

## II.   FINDINGS OF FACT

The Court makes the following findings of fact.  Any finding of fact that is more properly considered a conclusion of law, should be deemed as such.  Unless otherwise indicated, all findings of fact relate to the time relevant to the facts alleged in the Superseding Indictment.

### Events Prior to and Just After the Robbery

1.     Prior to August 16, 2019, Sanders was romantically involved with Teddi Tyree, who primarily resided in Atlanta, Georgia.  TT at 118, 126–127, Filing No. 135.

2.     Tyree had known Sanders for years and stayed with him at his house when she returned to Omaha in August of 2019.  TT at 122, Filing No. 135. Tyree recalled Sanders living in a white house and identified the residence depicted in Exhibit 58 as Sanders's house.  TT at 123-124, Filing No. 135; Govt. Ex. 58.

3.     When Tyree stayed with Sanders, they would share the same bedroom.  TT at 123, Filing No. 135.

4.     Tyree recalled Sanders possibly having two Hummers, one of them being white.  TT at 125, Filing No. 135.

5.     Tyree arrived in Omaha on Wednesday, August 14, 2019, and planned to stay until Saturday, August 17, 2019.  TT at 132, 134, Filing No. 135.

6.     When she arrived, Tyree rented a white Infiniti Q-50 (the "Infiniti") from Thrifty Rent a Car at Omaha's Eppley Airfield.  TT at 134–138, Filing No. 135; Govt. Ex. 35, 36. The rental agreement identified the rental period starting on August 14, 2019

through August 17, 2019.  TT at 137; Govt. Ex. 35, 36.  The Infiniti displayed Nebraska license plate "VYE 498."  TT at 137-138, Filing No. 135; Govt. Ex. 35, 36.

7.      At the time she rented the Infiniti, Tyree was given a key-fob.  TT at 139.

8.      Molly Floodman, owner of Thrifty Car Rental at Eppley Airfield, testified that at the time she rented the white Infiniti to Tyree, Tyree would have been given one fob. TT at 178, 180, Filing No. 135.  Floodman also confirmed that because the white Infiniti was a push button start, the car would not start unless the fob was inside the vehicle.  TT at 179, 183, Filing No. 135.

9.      Tyree testified the Infiniti she rented had the same license plate of the white Infiniti used to rob Bank of the West on August 16, 2019.  TT at 138–139, Filing No. 135; Govt. Ex. 14.

10.     On the evening of August 15, 2019, after a few stops, Tyree and Sanders parked the Infiniti at Pine Tree Apartments (her dad's residence) and took Sanders's Hummer back to Sanders's house.  TT at 149, Filing No. 135.

11.     When they parked the Infiniti back at the Pine Tree Apartments, Tyree took the key-fob with her.  TT at 152, Filing No. 135.  Tyree stated that the only two people that would have known where the white Infiniti was parked that evening were her and Sanders.  TT at 149, Filing No. 135.  Tyree also stated that on the morning of August 16, 2019, she did not give the key-fob to the Infiniti to anyone else and the key-fob was at Sanders's residence.  TT at 167, Filing No. 135.  On the afternoon of August 16, 2019, Tyree discovered the Infiniti was missing.  TT at 158, Filing No. 135.

12.     At trial, appearing as a witness cooperating with the government, Wilson testified that he and Sanders robbed Bank of the West on August 16, 2019.  TT at 231, Filing No. 136.

13.     On August 15, 2019, Sanders arrived unannounced at Wilson's apartment complex.  TT at 243, Filing No. 136.  Phone records show three (3) missed calls from Sanders to Wilson's phone on the evening of August 15, 2019.  TT at 346, Filing No. 136; Govt. Ex. 46, 63.  Sanders arrived at Wilson's home in a "white newer vehicle."  TT at 244, Filing No. 136.

14.     Wilson testified that when Sanders knocked on his door, Wilson saw another person in the driver's seat who remained in the vehicle.  TT at 244, Filing No. 136.  When Sanders left Wilson's home, Wilson saw that the driver of the white vehicle was a woman.  TT at 246, Filing No. 136.

15.     Sanders entered Wilson's residence to have a conversation.  TT at 244, Filing No. 136.  During that conversation, Sanders asked Wilson to come by his house in the morning and to bring a mask.  TT at 244–245, Filing No. 136.  Sanders said there would be a "lick" tomorrow, which, according to Wilson, meant a robbery.  TT at 245, Filing No. 136.

16.     The next morning on August 16, 2019, after dropping off his wife and children, Wilson drove to Walgreens on 72nd and Cass Streets where he purchased a black cloth and a sewing kit.  TT at 250, Filing No. 136.

17.     At around 8:30 A.M. on August 16, 2019, Wilson texted a third-party friend that he was "with sf sky" and that he was "unarmed."  TT at 251–253, Filing No. 136; Govt. Ex. 42.  Wilson explained that "sf sky" was a nickname he had for Skyler Sanders.  TT at

4

251–253, Filing No. 136; Govt. Ex. 42.  Wilson then traveled to Sanders's house in Wilson's silver-gray Chevy Equinox.  TT at 254.

18.     When Wilson arrived at Sanders's house, he observed a white Infiniti sedan. TT at 255, Filing No. 136.  Wilson testified this was the same newer white vehicle he had seen the night before at his apartment.  TT at 255, Filing No. 136.

19.     After he arrived, Wilson entered Sanders's home and went to the kitchen area.  TT at 255, Filing No. 136.  Wilson did not see anyone else in the house that morning. TT at 256, Filing No. 136.  While in Sanders's residence, Wilson observed Sanders cut eye holes out of a green beanie cap.  *Id.*  Wilson also observed Sanders with a metallic gray firearm.  TT at 257, Filing No. 136.

20.     At some point that morning, Sanders and Wilson left the residence.  *Id.* Sanders had a bag and was wearing a gray sweatshirt and pants.  TT at 255, Filing No. 136.  Sanders took Wilson's phone and left it at the residence.  TT at 257–258, Filing No. 136.

21.     Sanders and Wilson exchanged keys and Wilson was to drive the Infiniti while Sanders drove Wilson's Equinox.  Govt. Ex. 12; TT at 257, 260, Filing No. 136; Govt. Ex. 14.

22.     Wilson followed Sanders to an area near 84th Street and West Center Road where they parked near some apartments.  TT at 258, Filing No. 136.  After parking the vehicles, Sanders provided dealer plates and tape to cover the license plates.  TT at 260–261, Filing No. 136.

23.     Mark Svoboda testified that on August 16, 2019, he lived in an apartment within the Westgate subdivision near 3450 South 82nd Avenue (TT at 109, Filing No. 135;

Govt. Ex. 54).  Svoboda testified that on the morning of August 16, 2019, he was at his apartment.  TT at 111, Filing No. 135.  He testified it was a clear day and his apartment had clear views of the parking lot and street in the front of the apartment complex.  TT at 110, 113, Filing No. 135; Govt. Ex. 54.

24.     At around 10:20 A.M. August 16, 2019, Svoboda looked out the windows of his apartment and saw a white Infiniti and a Chevy Equinox parked in front of his building on the street along 82nd Avenue.  TT at 111–113, Filing No. 135; Govt. Ex. 12, 22.  These were not cars that belonged to others at the apartment complex, and he had not seen them in the area before.  TT at 115, Filing No. 135.  Svoboda observed two black males, one with dreadlocks, near the back of the Infiniti.  TT at 112, 114, 117, Filing No. 135.  It appeared they were exchanging something in between the trunks.  TT at 112, 114, Filing No. 135.  Wilson testified he had dreadlocks at the time.  TT at 259, Filing No. 136.

25.     After parking the cars, Sanders and Wilson got back into the Infiniti, with Wilson driving.  TT at 261, Filing No. 136.  Sanders directed Wilson to the Bank of the West located at 87th Street and West Center.  TT at 262, Filing No. 136.

26.     As they arrived at Bank of the West, Sanders directed Wilson to let him out of the Infiniti but before Sanders exited the Infiniti, he pulled his gun and said, "Don't leave me."  TT at 263, Filing No. 136.

27.     Sanders was in the bank for "about a minute" before he returned to the vehicle with a black bag containing money and said, "Go."  TT at 263–264, Filing No. 136. Wilson then drove the white Infiniti back to where the Equinox was parked.  TT at 264, Filing No. 136.

6

28.    After arriving at the area where the Equinox was parked, Sanders told Wilson to grab the dealer tags off the plates.  TT at 265–266, Filing No. 136; Govt. Ex. 22.  Both Sanders and Wilson then got into the Equinox and left the area.  TT at 267, Filing No. 136.  Sanders drove the Equinox to a community center near 24th Street and Woolworth Avenue.  TT at 268, Filing No. 136.  Sanders then exited the vehicle with the bag of money and entered the community center.  TT at 268.

29.    Wilson did not receive money from the robbery, but asked Sanders if he was going to receive some of it.  TT at 269, Filing No. 136.  For days after the robbery, Wilson texted Sanders stating, "We have to talk," "I need my please help," "Please, can I get me," and "Can I get mine" which Wilson explained were requests for his cut of the money.  TT at 272, Filing No. 136.

30.    After the robbery, all the cash in the Bank of the West branch was counted and recorded on a balance sheet to determine how much money was missing from the drawers.  TT at 172, 173, Filing No. 135.  The Bank determined the robber took $36,959.  TT at 175, Filing No. 135; Govt. Ex. 64.  At the time of the robbery, Bank of the West was FDIC insured and maintained its own FDIC certificate number at each branch.  TT at 175-176, Filing No. 135; Govt. Ex. 65–66.

**Bank Employee Testimony of the Robbery**

31.    T.J. Andreasen testified that on the morning of August 16, 2019, he was working as a part-time teller at the Bank of the West branch.  TT at 16, Filing No. 135; Govt. Ex. 8). Also working on August 16, 2019, were Shnobia Curry and Rick Loftin. (TT at 18, Filing No. 135).

7

32.     Andreasen testified he was "work friendly" with Curry and they would often text.  TT at 19, Filing No. 135. Sometimes Curry would mention her boyfriend who was nicknamed "Sky."  TT at 20, Filing No. 135.

33.     At approximately 10:34 A.M. on August 16, 2019, a person "rushed" into the bank through the front doors "all covered up" and wearing a "gray hoodie."  TT at 28, Filing No. 135; Govt. Ex 1.  Andreasen could not see any defining characteristics of the person because the person had their face and hands covered.  TT at 28, Filing No. 135; Govt. Ex 1.  Based upon the voice and body stature of the person, Andreasen assumed the person was a male.  TT at 28, Filing No. 135.

34.     After entering the bank, the robber first went to Andreasen's teller station. TT at 28, Filing No. 135; Govt. Ex 1, 7.  The robber said, "Don't press any buttons," "give me all the money."  TT at 29, Filing No. 135.  The robber also said he didn't want a dye pack or track pad with the money.  TT at 29, Filing No. 135.

35.     After the demand, Andreasen removed the money from the top and bottom drawers of his station and put it in a bag.  TT at 32, Filing No. 135; Govt. Ex 1, 7. Andreasen testified that he gave the money to the robber because he was "scared."  TT at 33, Filing No. 135.

36.     Andreasen testified he was familiar with guns and recognized that the robber had a gun.  TT at 34–35, Filing No. 135; Govt. Ex 1, 7.  Andreasen was within reaching distance of the robber's firearm.  TT at 34, Filing No. 135; Govt. Ex 1, 7. Andreasen said the robber kept hitting the gun on the teller station telling him to "Hurry up, hurry up."  TT at 35, Filing No. 135; Govt. Ex 1, 7.  Andreasen said the gun sounded

like it was made of metal when the robber banged it on the counter.  TT at 35, Filing No. 135.

37.     After the robber left Bank of the West, Andreasen went to the windows that overlooked the Bank of the West parking lot.  TT at 38, Filing No. 135.  Andreasen saw a white Infiniti car with a Baxter plate.  TT at 38, Filing No. 135.  Andreasen believed he saw the robber get into the passenger side of the car.  TT at 38, Filing No. 135.  When the police arrived, Andreasen was interviewed and described the robber as tall, around "six-three," big build, and African American "by the way he talked."  TT at 40–41, Filing No. 135.

38.     Rick Loftin, the Bank of the West branch manager working the day of the robbery, also testified.  TT at 83–84, Filing No. 135.  Loftin testified that on the date of the robbery Bank of the West did not have security but did have cameras.  TT at 85, Filing No. 135; Govt. Ex. 1–8.

39.     Loftin said the Bank of the West schedule would have indicated that on August 16, 2019, only three employees would be working.  TT at 87, Filing No. 135.  Loftin also testified that on the morning of the robbery, the bank was not busy.  TT at 89, Filing No. 135.

40.     At the time of the robbery, Loftin recalled seeing a car pull up and an individual jump out of the car passenger side of the car with a gun run through the front door of Bank of the West.  TT at 92, 94, Filing No. 135.

41.     The robber was fully clothed with a mask.  TT at 94, Filing No. 135; Govt. Ex. 1–8.  Loftin thought the robber was about "six-three" and a male from the tone of his voice.  TT at 94, 105, Filing No. 135.  Loftin, who himself owns a pistol, observed the

9

robber carrying a pistol in his hand and pointing it at him and the tellers.  TT at 95, 97–98, 100, Filing No. 135; Govt. Ex. 1–8.  Loftin said the pistol appeared to be real.  TT at 95, Filing No. 135; Govt. Ex. 1-8.

42.   As Bank of the West was getting robbed, Loftin followed his training.  TT at 95, Filing No. 135.  The robber provided Loftin a bag and said, "Give me all the money" and "fill it."  TT at 95, 100–101, Filing No. 135; Govt. Ex. 1–8.

43.   As the robber tapped on the counter with the gun, Loftin emptied out his cash drawer and put the money in the bag.  TT at 95, Filing No. 135; Govt. Ex. 1–8.  When the robber tapped the gun on the counter, Loftin said it "sounded like a pistol hitting wood."  TT at 100, Filing No. 135; Govt. Ex. 1–8.

44.   Shnobia Curry was a teller working the Bank of the West drive through on August 16, 2019. TT at 43, Filing No. 135.

45.   Curry had met Sanders about 10 or 11 years prior to the robbery.  TT at 57, Filing No. 135.  Curry positively identified Sanders in the courtroom at trial and described him as being over six foot and having a muscular build.  TT at 57, 78, Filing No. 135.

46.   Curry and Sanders would have "relations" from time to time.  TT at 61, Filing No. 135.  Curry would communicate daily with Sanders through text messaging, iPhone messages, or Snapchat.  TT at 62, 65, Filing No. 135; Govt. Ex. 51.  Curry would often meet Sanders for lunch but did not want him coming to Bank of the West.  TT at 65–66, Filing No. 135.

47.   On August 15, 2019, Curry received a text from Sanders saying "What's poppin'? How's the slaveship goin'?"  TT at 72, Filing No. 135; Govt. Ex. 51.  Curry replied, "Shit it's going but I found some things out."  TT at 72, Filing No. 135; Govt. Ex. 51.  Curry

testified this communication had to do with a prior work issue she had been involved in. TT at 72, Filing No. 135.

48.     Curry recalled Bank of the West not being busy the morning of August 16, 2019.  TT at 47, Filing No. 135.

49.     That morning, Curry received a Snapchat communication from Sanders around 9 A.M.  TT at 77, Filing No. 135.  She explained that Snapchat messages erase as soon as they are opened.  TT at 76, Filing No. 135.

50.     One of the Snapchat messages from Sanders asked, "if we were busy."  TT at 77, Filing No. 135.  Another Snapchat message from Sanders asked, through the use of a pig emoji, if there were police around.  TT at 77–78, Filing No. 135.  Curry responded "Yes, they were" because Curry wanted to deter Sanders from coming to the bank.  TT at 78, Filing No. 135.

51.     When the robber entered Bank of the West, Curry was in the drive-through teller station (TT at 47-48, Filing No. 135; Govt. Ex. 1–8).  Curry described the robber as muscular and over six feet tall and "black" by the tone of his voice.  TT at 48, 56, Filing No. 135; Govt. Ex. 1–8. The robber's face and hands were covered.  TT at 49, Filing No. 135; Govt. Ex. 1–8.

52.     Curry testified she was familiar with guns and said the robber had a "gun brandished."  TT at 49, Filing No. 135.  The robber said to her, "Bring your money up here too."  TT at 52–53, Filing No. 135.

53.     While Curry was giving money to the robber, she was about three feet from the firearm.  TT at 49, Filing No. 135; Govt. Ex. 1–8.  The robber tapped the firearm on the counter and held it in the air.  TT at 49–50, Filing No. 135.  When the firearm was

tapped on the counter, Curry said it sounded like real silver hitting a counter.  TT at 50, Filing No. 135.  Curry described the robbery as "very scary."  TT at 80, Filing No. 135.

54.     When asked at trial, Curry acknowledged that the robber and Sanders had the same height and same build.  TT at 79, Filing No. 135.  Based on what Curry saw the day of the robbery and what she knew about Sanders, she thought there was a chance the bank robber could have been Sanders.  TT at 80, Filing No. 135.

55.     After the robbery, Bank of the West was closed, and the police were called. TT at 55, Filing No. 135.  Curry was released from the bank close to 1 P.M.  TT at 56, Filing No. 135.

56.     Later that day, around 3:30 P.M., Curry went to Sanders's home.  TT at 57, Filing No. 135.  Curry said she and Sanders were supposed to get lunch that day but didn't.  TT at 58, Filing No. 135.  Instead, he invited her over to his house.  TT at 58, Filing No. 135.  When she arrived at Sanders's house, they sat on the couch and watched a movie "The Town."  TT at 59, Filing No. 135.  Curry recalled being at Sanders's house for 10-15 minutes that day but did not talk about the robbery.  TT at 80, Filing No. 135.

## Police Investigation of the Robbery

57.     Officer Brad Bornhoft of the Omaha Police Department (OPD) and his partner were working road patrol in the southwest precinct on the morning of August 16, 2019.  TT at 186, Filing No. 135.  Shortly after 10:34 A.M., Bornhoft received a radio call that the Bank of the West had been robbed.  TT at 186, Filing No. 135.  Bornhoft and his partner immediately responded, and when they arrived at Bank of the West, they made contact with Loftin.  TT at 188, Filing No. 135.

12

58.     Loftin reported that a male party, approximately six foot, four inches tall with a large build, armed with a handgun and wearing a mask robbed Bank of the West.  TT at 188–189, Filing No. 135.  The bank manager reported that the suspect got into a newer model white Infiniti and left eastbound on West Center Road.  TT at 190, Filing No. 135.

59.     Bornhoft immediately broadcasted that information to inform other officers the description of the suspect and the vehicle.  TT at 189–190, Filing No. 135.  Bornhoft secured the scene until the OPD robbery unit arrived and took over the investigation.  TT at 192-93, Filing No. 135.

60.     Also working road patrol on the morning of August 16, 2019, was Officer John Vailliant.  TT at 195, Filing No. 135.  Vailliant was dispatched to assist with the Bank of the West the morning of August 16, 2019.  TT at 196, Filing No. 135.

61.     Vailliant was called to respond to a suspicious activity in the area of 3328 South 82nd Avenue.  TT at 196, Filing No. 135.  While in the area, Vailliant observed a white Infiniti parked on the west side of 82nd Avenue, in front of 3328.  TT at 197, Filing No. 135.  Vailliant identified Government Exhibit 22 as the white Infiniti he observed and secured in that area.  TT at 197–199, Filing No. 135; Govt. Ex. 22.

62.     Vailliant observed the vehicle was parked and not running.  TT at 198, Filing No. 135; Govt. Ex. 22.  There was no sign that the vehicle had been broken into.  TT at 198; Govt. Ex. 22.  Vailliant observed black tape on the back license plate as well as a black cloth on the driver's side seat.  TT at 202–205, Filing No. 135; Govt. Ex. 22.

63.     After arriving on the scene, Tiffany Korth, an OPD Detective, spoke with Loftin who reported that the robbery suspect was possibly a black male, late 20s, six-four,

13

and 240-250 pounds.  TT at 208, Filing No. 135.  Loftin reported the robber left the bank in the front passenger seat of a white sedan with Baxter plates.  TT at 208, Filing No. 135.

64.     Korth received information that the DNA found on the black cloth had a CODIS hit that matched Wilson's DNA.  TT at 219–220, Filing No. 135.  CODIS is the Combined DNA Index System which has the DNA profiles of convicted felons.  TT at 219, Filing No. 135.

65.     FBI Special Agent John Hallock also responded to the Bank of the West robbery.  TT at 283, Filing No. 136.  Hallock confirmed the phone numbers used by Wilson, Tyree, Curry, and Sanders at the time of the robbery.  TT at 284–286, Filing No. 136; Govt. Ex. 63.  Hallock, through the National Crime Information Center, also confirmed that Sanders's reported height was approximately six-one and 220 pounds. TT at 288, Filing No. 136.

66.     On October 3, 2019, Hallock attempted to execute a search warrant for Sanders's DNA.  TT at 288, Filing No. 136.  When Hallock's team located Sanders, he ran.  TT at 288, Filing No. 136.  Hallock eventually obtained Sanders's DNA and recovered Sanders's phone, which was forensically analyzed by the FBI.  TT at 289–292, 322–328, Filing No. 136.  During the investigation, Hallock confirmed that the distance from Sanders's residence to the Pine Tree Apartment Complex was under 4 miles.  TT at 293, Filing No. 136.

67.     Following the robbery, police secured the white Infiniti and photographed the vehicle.  TT at 301, Filing No. 136.  OPD towed the white Infiniti to impound where it was then photographed and processed for prints and DNA.  TT at 302–306, Filing No. 136; Govt. Ex. 25–33.

14

68.     Within the vehicle was a black cloth on the driver's seat.  TT at 306, Filing No. 136.  OPD technicians logged the DNA swabs and other recovered items into OPD's evidence tracking system.  TT at 308–309, Filing No. 136.

69.     On September 10 and 17, 2019, OPD Detective Mickey Larson conducted surveillance of Wilson and Sanders interacting at a football practice at Benson High School.  TT at 311, Filing No. 136; Govt. Ex. 43.  Larson also identified a Chevy Equinox which was registered to Wilson's wife.  TT at 312, Filing No. 136; Govt. Ex. 12.  On October 3, 2019, Larson also obtained Wilson's DNA and phone, which was forensically analyzed by the FBI.  TT at 315, 322–328; Govt. Ex. 20.

70.     FBI Special Agent Ryan Williams testified about historical call detail records relating to the phones of Wilson and Sanders.  TT at 337, Filing No. 136).  Williams created Government Exhibit 46, a summary chart showing Sanders's phone calls and texts that occurred between August 15, 2019 and August 17, 2019.  TT at 338, Filing No. 136; Govt. Ex. 46.

71.     Government Exhibit 46 showed numerous phone calls between Sanders's phone, Tyree, and Curry on those three (3) days.  Govt. Ex. 46, 63.  Government Exhibit 46 also showed three (3) calls made by Sanders's phone to Wilson's phone the evening of August 15, 2019 at 8:52 P.M. (two (2) calls) and 9:05 P.M.  TT at 346, Filing No. 136; Govt. Ex. 46, 63.  Each of those calls were forwarded to voice mail.  TT at 346, Filing No. 136; Govt. Ex. 46, 63.

72.     On the morning of August 16, Sanders's phone had a series of calls between 8:20 and 8:24 A.M.  TT at 347, Filing No. 136; Govt. Ex. 46, 63.  There was no

further activity on Sanders's phone until 10:26 A.M., which showed an incoming call that was not answered and directed to voicemail.  TT at 347, Filing No. 136; Govt. Ex. 46, 63.

73.     At 10:43 A.M., Sanders's phone received an incoming text message, which would be consistent with an incoming picture.  TT at 347-48, Filing No. 136; Govt. Ex. 46, 63.  The next activity was not until 11:40 A.M.  TT at 348, Filing No. 136; Govt. Ex. 46, 63.

74.     Between 8:24 A.M. and 11:40 A.M. on the morning of August 16, 2019, Sanders's phone activity showed only one incoming call, which went directly to voicemail and there was no outgoing activity on that cell phone during that time.  TT at 349, Filing No. 136; Govt. Ex. 46, 63.  Williams also confirmed that communication through the use of a Snapchat application would not appear as a voice call or text message because the messages are sent through the internet and not the phone service provider's data.  TT at 353, Filing No. 136.

75.     Williams also reviewed phone records for Wilson for the time period of August 15, 2019, through August 17, 2019.  TT at 349, Filing No. 136; Govt. Ex. 53, 63. During this time, there were no calls between Wilson, Curry, and Tyree.  TT at 352, Filing No. 136; Govt Ex. 53, 63.  Williams did identify numerous calls and texts between Wilson and Sanders.  TT at 352, Filing No. 136.

76.     The Nebraska State Patrol (NSP) performed DNA analysis of the mask and other items found in the vehicle.  TT at 362–63, Filing No. 136; Govt. Ex. 74.  This included known samples of DNA from both Wilson and Sanders.  TT at 364, Filing No. 136; Govt. Ex. 74.

16

77.     The quantitative finding made by the NSP concluded with a considerably high confidence level that Wilson was included as a contributor to the mixture of DNA found on the mask.  TT pg. 367, Filing No. 136; Govt. Ex. 74.  The quantitative finding made by the NSP concluded with a considerably high confidence level that Sanders was included as a contributor to the mixture of DNA found on the swab taken from the steering wheel of the white Infiniti.  TT pg. 368, Filing No. 136; Govt. Ex. 74.

## III.    CONCLUSIONS OF LAW

### a.     Count I – Bank Robbery

**Elements**

The crime of bank robbery in violation of 18 U.S.C. § 2113(a), as charged in Count I of the Second Superseding Indictment, has three elements, which the government is required to prove beyond a reasonable doubt:

*One*: That the defendant took money from Bank of the West in the presence of Bank of the West employees while that money was in the care or custody of Bank of the West;

*Two*, such taking was by force, violence, or intimidation; and

*Three*, the deposits of Bank of the West were then insured by the Federal Deposit Insurance Corporation.

Eighth Circuit Model Jury Instr. § 6.18.2113A (2020).

**Application**

Sanders does not dispute that money that was federal insured was taken from Bank of the West, nor does he dispute that it was done by force, violence, or intimidation. Loftin's testimony established that the deposits of the Bank of the West were federally

17

insured by the FDIC. The employees' consistent testimony also established that the tone and demeanor of the robber's voice while pounding the firearm on the counter resulted in, at a minimum, threat or intimidation. Accordingly, the second and third elements are easily satisfied.

Sanders only meaningfully disputes the first element, arguing that there is insufficient evidence that he was the individual who robbed the bank. However, to the contrary, the evidence shows beyond a reasonable doubt that Sanders committed the robbery. Wilson directly testified that Sanders organized and carried out the robbery. The Court recognizes that Wilson's testimony relating to Sanders's participation in the robbery was self-interested, but Wilson's testimony is corroborated by other testimony and evidence.

For example, less than an hour before the robbery, Curry received a Snapchat message from Sanders asking if the bank was busy and whether there were police (i.e. pig emoji) present. Sanders's specific questions about Curry's work and the presence of police showed he was gathering information to plan for the imminent robbery. Curry, who was intimately familiar with Sanders, testified that the robber's description matched Sanders.

Additionally, employees identified the Infinity as the getaway vehicle, and it was found nearby with markings and items consistent with Wilson's testimony. Tyree's testimony shows Sanders was the only person who knew where the Infiniti was parked and had the opportunity to obtain the Infiniti's key fob. Additionally, Svoboda testified seeing two black males, including one matching Wilson's description, pull up near his apartment in an Equinox and Infiniti. He saw them congregating near the trunk of the

18

Infiniti. Svoboda's account of what he saw that morning further corroborates Wilson's testimony that he was with Sanders.

The phone records also indicate Sanders attempted to contact Wilson several times to ensure his participation in the robbery. The government's analysis of Sanders's phone shows number of these calls and texts were between him and Curry, Tyree, and Wilson. However, on the morning of the robbery, between the time of 8:24 A.M. and 11:40 A.M., Sanders did not make any phone call or text. Sanders's phone only received one call, at 10:26 A.M., just eight minutes before the robbery, which went directly to voice mail.

The government proved beyond a reasonable doubt that Sanders was the common thread throughout its evidence. Considering the totality of the evidence, the Court finds that Sanders was the individual who took money from the Bank of the West on the morning of August 16, 2019. Accordingly, the government has met each element beyond a reasonable doubt and the Court finds Sanders guilty of bank robbery under Count I.

**b.      Count II – Brandishing a Firearm in Furtherance of a Crime of Violence Elements**

The crime of brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(C), as charged in Count II of the Superseding Indictment, has three elements, which the government is required to prove beyond a reasonable doubt:

*One*, the defendant committed or aided and abetted in the commission of the crime of bank robbery; as charged in Count I of the Second Superseding Indictment;

*Two*, the defendant knowingly possessed a firearm; and

19

*Three*: the defendant intentionally brandished the firearm in furtherance of the crime of bank robbery.

Eighth Circuit Model Jury Instr. § 6.18.924C-1 (2020); *see also* Committee Comment on § 6.18.924C-1 ("If an indictment alleges brandishing or discharge of a weapon, the instruction must be modified to add that as a separate element that must be proven beyond a reasonable doubt and found by a unanimous jury.").

### Application

Having found that the evidence shows beyond a reasonable doubt that Sanders committed bank robbery as charged in Count I, the first element of Count II is satisfied. The Court must determine whether Sanders possessed and brandished the firearm in furtherance of the bank robbery. Under § 924(c), the term "brandish" means "to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person." *See also Dean v. United States*, 556 U.S. 568, 572-73 (2009) (holding that under § 924(c), "[t]he defendant must have intended to brandish the firearm, because the brandishing must have been done for a specific purpose.").

Each Bank of the West employee present during the robbery consistently testified that the robber displayed a firearm. All of the employees, including Loftin, a gunowner, testified that they believed the weapon was a real firearm. They testified that the robber pointed the gun at each of them as he instructed them to deliver cash from their drawers. Further, they testified that the robber hit the firearm on the counter as he told each employee to hurry in handing over the money. The consistent testimony of the employees

20

establishes beyond a reasonable doubt that Sanders brandished a firearm in furtherance of the bank robbery.

Accordingly,

IT IS ORDERED:

1.      The Defendant, Skyler F. Sanders, is guilty of Counts I and II of the Second Superseding Indictment;

2.      A separate Order on Sentencing Schedule will be issued; and

3.      Judgment will be entered accordingly.


Dated this 30th day of December, 2021.

                                    BY THE COURT:

                                    s/ Joseph F. Bataillon
                                    Senior United States District Judge

21